STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**19-225**

WILLIAM T. DAVIS AND APRIL D. DAVIS

VERSUS

ROBERT L. MCELROY AND CLARISSA S. MCELROY

**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 96,053
HONORABLE C. ANTHONY EAVES, DISTRICT JUDGE

**********

**PHYLLIS M. KEATY**
**JUDGE**

**********

Court composed of John D. Saunders, Phyllis M. Keaty, and Jonathan W. Perry,
Judges.

**AFFIRMED.**

**Elvin C. Fontenot, Jr.**
**Attorney at Law**
**110 East Texas Street**
**Leesville, Louisiana 71446**
**(337) 239-2684**
**Counsel for Defendants/Appellants:**
     **Robert L. McElroy**
     **Clarissa S. McElroy**

**Max S. Antony**
**Antony Law Group, LLC**
**118 South Third Street, Suite A**
**Leesville, Louisiana  71446**
**(337) 239-6557**
**Counsel for Plaintiff/Appellee:**
     **William T. Davis**
     **April D. Davis**

**KEATY, Judge.**

Defendant[1] appeals a judgment rendered in this dispute involving a right-of-way (ROW) on his property. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

By way of a Grant of Predial Easement (GPE) dated February 16, 2005, Defendant, Robert L. McElroy,[2] as "Grantor," conveyed a twelve by six-hundred-ninety-two-foot (12 x 692) ROW to Roy O. Martin Lumber Company, L.L.C. (Martin) as "Grantee," simultaneously with McElroy's cash purchase from Martin of a tract of land that lies to the south of the ROW. In early 2013, Plaintiff, William T. Davis, bought several acres of land in Vernon Parish from Martin. The sale included Martin's rights to the ROW, which provided the only vehicular access to Davis's otherwise landlocked property. Later in 2013, Davis purchased an additional sixteen-foot (16) strip of land adjacent to the ROW, which, when added to the ROW, resulted in his having a twenty-eight-foot-wide access to his property.

Davis instituted this action in May of 2018 by filing a Petition for Declaratory Judgment and Injunctive Relief against McElroy regarding Davis's use and enjoyment of the ROW that Davis traverses to get to and from the property on which his home sits. Davis asserted that, on or about April 27, 2018, McElroy had begun constructing a metal fence that completely denied Davis use of the ROW. Davis sought a declaration of his right to use and enjoy the ROW without interference from McElroy, as well as a preliminary, and in due time a permanent, injunction enjoining

---

[1] Robert L. McElroy and his wife, Clarissa S. McElroy, are named as Defendants in this suit filed by William T. Davis and April D. Davis. For ease of discussion, we will sometimes refer to both Mr. and Mrs. McElroy as McElroy and we will sometimes refer to both Mr. and Mrs. Davis as Davis.

[2] Mrs. McElroy was also a party to the 2005 GPE and purchase of land.

and preventing McElroy from building a fence or otherwise interfering with Davis's use and enjoyment of the ROW.

In answer to Davis's Petition, McElroy denied preventing Davis from having use of and access to the ROW. In a reconventional demand, McElroy pointed out that Davis built a road on the sixteen-foot strip of land north of the ROW and dug a ninety-six-foot-long ditch in the middle of the ROW, thus preventing McElroy's use of the ROW. McElroy alleged that he was entitled to damages because, during the building of the road, Davis tore down a fence and two gates that McElroy had previously installed on the ROW. McElroy also requested that Davis be ordered to pay to have the ditch filled in with dirt. Davis answered the reconventional demand, denying that he destroyed any fence or gates on the ROW and denying that the ditch prevented McElroy's access to the ROW.

A bench trial took place on October 11, 2018. At the close of the evidence, the trial court ruled in open court that it was granting the declaratory judgment sought by Davis declaring his legal real right to fully use and enjoy the ROW and to install drainage ditches running parallel to and outside of the ROW to access his property without interference and disturbance from McElroy. Permanent injunctions were entered barring McElroy from building a fence or otherwise disturbing Davis's use of the ROW and preventing Davis from installing drainage ditches within the ROW. McElroy was ordered to remove his fence from the boundary line of the ROW, Davis was ordered to fill-in the drainage ditch currently located within the ROW with the right to relocate said ditch onto McElroy's property parallel to the ROW, and both parties were ordered to remove all items and debris from the ROW. Finally, Davis was ordered to pay McElroy $250, one-half the value of a gate McElroy previously installed on the west end of the ROW.

2

McElroy now appeals, asserting that the trial court erred 1) in "granting injunctions to the Davises that McElroy interfered with the use and exercise of the right-of-way by placing fence posts in the 12 foot right-of-way; and 2) in "not awarding damages to the McElroys for the destruction of fences and gates which previously existed on the right-of-way."

## DISCUSSION

"A predial servitude is a charge on a servient estate for the benefit of a dominant estate. The two estates must belong to different owners." La.Civ.Code art. 646. "A ROW is a conventional predial servitude, which means it is a predial servitude established by contract." *El Paso Field Serv., Inc. v. Minvielle*, 03-1293, p. 5 (La.App. 3 Cir. 3/3/04), 867 So.2d 120, 125. "The title creating a ROW regulates its use and the extent to which it is used. According to La.Civ.Code art. 730, any '[d]oubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate.'" *El Paso*, 867 So.2d at 125 (footnote omitted). In this instance, Davis's property is the dominant estate and McElroy's property is the servient estate.

"Obligations of the owner of the servient estate" can be found in La.Civ.Code art. 651, which provides in pertinent part:

> The owner of the servient estate is not required to do anything. His obligation is to abstain from doing something on his estate or to permit something to be done on it. He may be required by convention or by law to keep his estate in suitable condition for the exercise of the servitude due to the dominant estate.

Moreover, "[t]he owner of the servient estate may do nothing tending to diminish or make more inconvenient the use of the servitude." La.Civ.Code art. 748.

The Grant of Predial Easement (GPE) establishing the ROW at issue in this matter allowed Martin, as Grantee, to assign the ROW to a third party, and it specified that "[i]n consideration for this Predial Easement, Grantee is bearing all

3

costs of construction of the ROW." The GPE described the parties' intent in creating the ROW and how it was to be installed, as follows (emphasis added):

> INTENT: Grantee shall have the right and privilege to **open, clear, construct, operate, maintain, and improve a permanent vehicular access** for the purposes involved in the course of its business, most commonly being timber management and harvest, including the travel of heavy equipment which is a normal function of such activities; with the further understanding that **said use/installation is to be constructed, operated, and maintained in a manner to avoid or minimize damage to the adjoining land of Grantor**.

> INSTALLATION: **Access shall be constructed within the Easement ROW width of approximately 12 feet**, in a manner whereby a raised running surface of "roadbed contour" exists. That is, a raised running surface of 12 feet wide **shall have ditches running parallel to**, and laterally away in order to assure that the access will not degenerate into a canal; using soil excavated from ditches as roadbed material to be roughly leveled.

> **A cable or gate that has been installed by Grantor will remain and act as a method of closure for the ROW**. In such event, lock or locks will be applied with keys limited to Grantor and Grantee.

The GPE specified that "**MUTUAL BENEFIT shall be provided by this ROW, whereby Grantor and Grantee shall have use of the roadway at their conveniences**." (Emphasis added.) It further specified that "The roadway shall be installed and maintained within the permitted ROW width of 12 feet in a manner whereby a well-drained running surface exists, and especially with adequate drainage to assure that the roadway will not be degenerated into a canal or develop water holes." Notably, the GPE made no mention of a fence.

Louisiana Code of Civil Procedure Article 3601 provides, in part, that "[a]n injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law[.]" As this court explained in *El Paso*, 867 So.2d at 127 (footnotes omitted):

> However, La.Code Civ.P. art. 3663 authorizes the trial court to grant an injunction to protect a ROW if another obstructs or disturbs the ROW owner's possession or enjoyment of this real right in immovable property and if the ROW owner or their ancestors in title

4

have had this ROW for more than a year. When a party seeks an injunction on this ground, there is no need to make a showing of irreparable harm. In addition, nothing in Article 3663 suggests the existence of a mandate requiring these parties to prove that the law does not offer them any other adequate remedy.

"An injunction is an equitable remedy that the trial court should carefully design to achieve the essential correction at the least possible cost and inconvenience to the defendant." *Id.* at 128. "The trial court has great discretion to grant or deny injunctive relief; thus, we will not disturb its determination without proof that it manifestly abused its discretion." *Id.* at 124. McElroy's assigned errors challenge factual findings made by the trial court.

It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of 'manifest error' or unless it is 'clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.

*Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989).

At the start of trial, McElroy stipulated to the existence of the ROW, to its chain of title from Martin to Davis, and to Davis or his ancestors in title having the ROW in excess of one year. Four joint exhibits were accepted into evidence before testimony began: 1) the written and recorded ROW executed by McElroy and Martin on February 16, 2005, which included a Boundary Survey/Unit Map dated June 23, 2003; 2) the February 16, 2005 Cash Sale Deed in which McElroy acquired property from Martin; 3) the January 9, 2013 Cash Warranty Deed in which Davis acquired his property from Martin; and 4) fourteen photographs depicting various areas of the ROW. Ten additional photographs were admitted into evidence in conjunction with McElroy's testimony.

At trial, Davis explained that after acquiring his property from Martin, he purchased a sixteen-foot strip of land from his neighbors, the Hickmans, to give him

more room to build a road and to bury electrical and water lines to service his home and property. He also wanted to be able to get heavy equipment onto his property. According to Davis, when he bought his property and the sixteen-foot strip on the north side of the ROW, there were no fences on that side of the ROW. Thereafter, he spent several years and in excess of $40,000 building a twelve to fifteen-foot-wide road, of which ten to twelve feet are on the sixteen-foot strip with the remaining two to three feet extending onto the ROW. Davis stated that water would build up and wash out the road until he dug a ditch inside and along the length of the ROW and installed culverts with a retaining wall over a creek that crosses the ROW. While he knew that the wording of the ROW agreement allowed him to put a ditch beyond the ROW on McElroy's property, Davis said he dug the ditch inside the ROW to "placate" McElroy and minimize any intrusion onto McElroy's property.

Davis recalled that in early 2018, a member of a logging crew who used the road told him that fence posts had appeared in the middle of the road he was building. Davis investigated and discovered metal stakes in the ground with barbed wire strung across the top. Davis then placed several telephone calls to McElroy to ask whether he had placed the posts there, but McElroy never answered. Thereafter, Davis rolled up the barbed wire, removed the posts, and stacked them against a hurricane fence on McElroy's side of the ROW. Describing McElroy's offending fence at the time of trial, Davis said "it's T posts that go all the way from the black gate in the front of and it goes down the property line on the north side of the right-of-way all the way down to the property line on the east side." He added that McElroy's fence extends two to three feet into the road he built.

Davis testified that the fence interferes with his use of and defeats the purpose of the ROW. He explained that vehicles needed to be able to move to the side of the road or turn around, but that the metal posts prevented them from doing so due to

6

fear of damage to the vehicles. He also stated that he was concerned for his family's safety because of a big black post cemented into the ground near the entrance to the ROW from the public roadway could disable any vehicle going to his home for a house fire, health crisis, or other emergency. Davis stated that McElroy had dumped barbed wire and scrap metal within the ROW. Finally, Davis admitted that McElroy is unable to use the ROW to access his two acres that lie beyond the end of the ROW.

Mrs. April Davis testified that when she leaves work, picks up her two children, and drives home, taking a right onto the ROW is difficult. She explained that the entrance to the ROW is narrow, especially where the gate is located. She has to avoid a metal stake placed one foot into the road over the culvert which causes her to worry about veering off the road. Mrs. Davis stated that when the time changes and it gets dark earlier, her anxiety about driving down the ROW increases. Like her husband, she was anxious about the possibility of one of her family members having a medical emergency and help not being able to get to them. Mrs. Davis also expressed concern that the "razor" wire McElroy placed along the ROW could cut her young children or damage any vehicles that came in contact with it. Finally, she said that the "razor" wire prevented them from safely enjoying and maintaining their property.

McElroy did not dispute Davis's testimony concerning the location of the property lines. McElroy said that before Davis installed the culvert in the ROW, a creek emptied into a very deep ditch on the logging road. He explained that since Davis had cleared out trees and built the road on the ROW, people had been able to access the back of his property and some of his possessions had been stolen, including 300 pounds of copper. He testified that he did not live on his property where the ROW is located. Thus, in an effort to secure his property from theft, McElroy had a black iron gate fabricated in November 2017 at a cost of $500 which

7

he installed near the beginning of the ROW that leads to Davis's property. McElroy commissioned a survey in April of 2018 to determine his property line so he could install a barbed-wire fence to further secure his property. He admitted that there was room inside his property line to build a fence to protect his property from theft, but he noted that it would cost more than the barbed-wire fence he put in the ROW. McElroy later clarified that the "main reason" he had not put up a security fence on his property was because he had been sick and on vacation. He denied that he installed the gate and fence to impede Davis's access to his property.

McElroy stated that the front gate near the highway was locked when Davis acquired his property and that because both himself and Martin had a key; he did not give one to Davis. He kept the back gate unlocked to enable himself to mow without having to get off of his lawnmower. He explained that he had gone out of town for three weeks in 2014 or 2015, and, when he returned, a road was being built and the two gates had been dismantled. McElroy claimed that a man named Brian Dowden told him that he had been hired by Davis to build the road and that he pushed the fence posts down at Davis's direction. McElroy admitted, however, that he did not pursue legal action against Davis or Mr. Dowden at the time. Rather, he put another fence in the ROW.[3]

On cross-examination, McElroy admitted that Davis had not inhibited his ability to use the ROW to access his property, and he agreed that ditching and draining are important to the maintenance of a road. He further agreed that there is no lighting on the ROW and traversing the road at night is potentially dangerous.

Before addressing McElroy's assignments of error, we echo an observation made by the trial court, which remarked during trial, that the parties did not

---

[3] McElroy first stated that he put the fence "down the middle of the driveway that [Davis] said was a right-of-way." Later, McElroy said he put the fence three inches inside the ROW.

"understand all the ramifications" associated with the ROW. Our appreciation of the record evidence convinces us that neither McElroy, who had no legal representation when the ROW was created, nor Davis, who purchased his property approximately eight years after the ROW was created, understand the basic principles that govern predial servitudes. Moreover, neither understood the specifications provisions governing the particular ROW at issue in this matter, the most important being that the ROW was to be of "mutual benefit" to both the dominant and the servient estate.

### Was an Injunction Properly Rendered Against McElroy?

McElroy asserts that Davis failed to present any evidence to show that he interfered with his use of the ROW. We disagree. In formulating its judgment in this case, the trial court noted that the ROW "has to be clear for both parties to be able to access it." The trial court observed that the GPE allowed Davis to "build a 12 foot wide road down there and ditch[;]" however, the document "doesn't say how long, how wide, the ditch has to be either, so [Davis] can make fences be taken down." Based on the evidence presented, the trial court found that Davis's placement of the drainage ditch within the boundaries of the ROW interfered with McElroy's use of the entire length of the ROW. The trial court likewise determined that McElroy's placement of the T posts and barbed-wire fence on his northern property line, which coincided with the edge of the ROW, interfered with Davis's use of the ROW. Thus, the trial court ordered Davis to fill in the current ditch located within the ROW, while recognizing Davis's right "to install said drainage on the outside of the Right-of-Way and onto Defendant['s] property, running parallel with the Right-of-Way." The trial court further directed both parties to remove from the ROW "any and all metallic items and/or other debris belonging to them and / or any other party."

9

After having reviewed the testimony and evidence presented at trial, we find that Davis did offer proof that McElroy interfered with his use and enjoyment of the ROW. Accordingly, we find no manifest abuse of the trial court's vast discretion in enjoining McElroy from placing a fence or other objects within the ROW. McElroy's first assigned error lacks merit.

### Was McElroy Adequately Compensated for his Damages?

In his second assigned error, McElroy asserts that the trial court erred in failing to award him damages "for the destruction of fences and gates which previously existed on the right-of-way." McElroy presents a very sparse argument in support of this alleged error. In his appellant brief, he points to twenty-five lines of his own testimony as evidence that gates and a fence were present when Davis purchased his property.

Based on the testimony and evidence presented at trial, the trial court awarded McElroy $250, which represented one half of the amount McElroy testified as to having been the cost of the black iron gate he installed at the front of the ROW in 2017. The trial court declined to award McElroy damages for the alleged destruction of a fence at the hand of Davis or someone acting on his behalf.

As previously mentioned, the GPE creating the ROW made no mention of a fence. Regardless, the law provides that "[t]he owner of the servient estate may do nothing tending to diminish or make more inconvenient the use of the servitude." La.Civ.Code art. 748. This court has held that "when the title provides the exact dimensions of the area affected by the servitude, that contract must be given full effect. The owner of the servient estate may not, by unilateral action, effectively take over unused areas of the servitude by establishing thereon permanent structures." *Red River v. Noles*, 406 So.2d 294, 297 (La.App. 3 Cir. 1981). Whether a fence actually existed prior to Davis's purchase of his property in 2013 is irrelevant

10

to our decision in this matter. Just as Davis could not block the ROW with a ditch, McElroy could not block the ROW with a fence, regardless of Davis's purchase of an additional sixteen-foot strip of land which gave him more room to construct a road to where his house was built. For these reasons, we cannot say that the trial court manifestly erred in determining that McElroy failed to prove that he was entitled to damages for the destruction of a fence or more than one gate. Accordingly, we find no merit to McElroy's second assigned error.

## DECREE

The judgment of the trial court is affirmed in its entirety. All costs of this appeal are assessed against Defendants, Robert L. McElroy and Clarissa S. McElroy.

**AFFIRMED.**